FILED ENTERED
LOGGED RECEIVED
APR 30 2013
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

## ATTACHMENT A - STATEMENT OF FACTS: RACHEL ONDRIK

*The United States and the Defendant agree that if this case proceeded to trial, the United States would prove the following facts below beyond a reasonable doubt. They agree that these are not all of the facts that would be proved if this case proceeded to trial.*

Defendant **RACHEL ONDRIK** ("**ONDRIK**") was a Special Agent of the United States Department of Commerce ("DOC"), Office of the Inspector General ("OIG"). In this role, she was covered by the United States Office of Personnel Management's series 1811, which sets forth requirements for positions that supervise, lead, or perform work involving the planning, conducting, or managing of investigations related to violations of federal criminal laws. Work in this series requires knowledge of criminal investigative techniques, rules of criminal procedures, laws, and precedent court decisions concerning the admissibility of evidence, constitutional rights, search and seizure, and related issues in the conduct of investigations.

**ONDRIK**'s first duty station was in Washington, D.C. In 2007, she transferred to the DOC OIG office in Atlanta, Georgia. In 2009, she returned to Washington, D.C. where she continued to work for DOC OIG. During and after this change of station from Georgia to Washington, D.C., **ONDRIK** defrauded and attempted to defraud the United States and the DOC by submitting false writings and making material misrepresentations to the DOC while seeking reimbursement for relocation expenses. **ONDRIK** submitted these false writings to National Institute of Standards and Technology ("NIST") Office of Financial Resource Management, a division of the DOC located in Gaithersburg, Maryland, which processed DOC OIG's travel claims.

On or after July 7, 2009, **ONDRIK** applied for and was granted relocation benefits from the DOC because her transfer from Atlanta to Washington, D.C. was determined to be in the government's interest. **ONDRIK**'s authorized relocation benefits included reimbursement for a househunting trip, *en route* travel, and temporary quarters subsistence expenses ("TQSE"). Approval of these reimbursements was contingent on **ONDRIK**'s adherence to the Federal Travel Regulation.

Contemporaneous e-mail communications between **ONDRIK** and **Kirk Yamatani**, a fellow DOC OIG agent also relocating from Atlanta to Washington at the same time, show that both agents were aware of the rules and regulations governing their relocations and reimbursements for related expenses, yet both **ONDRIK** and **Yamatani** nevertheless attempted to secure payment from the DOC in amounts exceeding that authorized by the governing regulations. For example, in an e-mail exchange on May 6, 2009, **Yamatani** and **ONDRIK** agreed that the Federal Travel Regulation permitted a certain method of reimbursement, known as the "fixed rate" method, for a period of time limited to 30 days, with no extensions permitted. Although **Yamatani** and **ONDRIK** agreed that their supervisors at OIG were unaware of the temporal limitation on this entitlement, they agreed to conceal these limitations from DOC OIG and to seek reimbursements in excess of what the regulation authorized.

Further, on or about August 20, 2009, **ONDRIK** knowingly submitted a false travel voucher seeking reimbursement for a ten-day househunting trip she claimed that she and her husband took to the Washington, D.C. area between July 22 and July 31, 2009. On the voucher, **ONDRIK** claimed that they departed their Acworth, Georgia, home on the morning of July 22, 2009, drove their personal vehicle to Rockville, Maryland, and then later returned by car to Georgia on July 31, 2009. In the voucher for this househunting trip, **ONDRIK** claimed reimbursement for various expenses, such as lodging, meals, mileage. In fact, **ONDRIK** did not make a househunting trip during this period, nor did the actual househunting trip she took earlier in July last ten days, nor did she incur the claimed expenses. **ONDRIK** nonetheless knowingly submitted the voucher containing that false statement to DOC OIG and NIST claiming reimbursement of $4058.75.

On or about August 10, 2009, **ONDRIK** submitted false travel vouchers seeking reimbursement of $1,531 for her official en route travel to her new duty station, and on or about September 26, 2009, **ONDRIK** submitted a false TQSE voucher claiming $33,973.50 in expenses, more than $20,000 over what the Federal Travel Regulation allowed. In **ONDRIK**'s en route voucher, she claimed that she and her family departed their Georgia home on August 5, 2009 at 8:00 am and drove their personal vehicle to Roanoke, Virginia, where they spent the night. **ONDRIK** then claimed to have driven the rest of the trip to Clarksburg, Maryland, the following day. On her voucher, **ONDRIK** claimed reimbursement for meals, hotel, mileage, and "miscellaneous expenses." In fact, **ONDRIK** and her family had traveled to Maryland on July 28, 2009, during the period she claimed they were househunting, and did not return to Georgia as her vouchers falsely claimed. **ONDRIK** was aware that both vouchers contained false information when she completed them and submitted them to DOC OIG and NIST. Altogether, **ONDRIK** submitted at least three false vouchers seeking reimbursement from the United States for $39,563.25.

When a NIST examiner reviewed **ONDRIK**'s TQSE voucher, she realized the amount claimed was far in excess of **ONDRIK**'s actual entitlements under the Federal Travel Regulation, denied it, and instead paid only the $10,815 to which **ONDRIK** was entitled. **ONDRIK**, however, persisted in her claim for reimbursement in the higher amount, despite the fact that she knew that her claim exceeded the 30 day period authorized by regulations. On several occasions between 2009 and 2011, **ONDRIK** reaffirmed the earlier false statements in her vouchers and made false statements regarding the circumstances of her claims for reimbursement, which constituted obstructive conduct.

Between June 2009 and February 2011, **ONDRIK** further committed several instances of time and attendance fraud against her agency. The actual loss to the United States that was the direct and proximate result of **ONDRIK**'s knowing and intentional conduct was approximately $14,000.

I have read this statement of facts, and have carefully reviewed it with my attorney. I acknowledge that it is true and correct.

_4-30-13_  
Date

_[signature]_  
Rachel Ondrik

I am Rachel Ondrik's attorney. I have carefully reviewed the statement of facts with her.

_4-30-13_  
Date

_[signature]_  
Thomas Abbenante, Esq.